ELG/jak        04-04-03

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **CATHERINE HOMAN, et. al.,** | ) | **CASE NO.**    5:02 CV 1738 |
| | ) |                 5:00 CV 1326 |
| | ) | |
| | ) | **JUDGE ADAMS** |
| **Plaintiffs,** | ) | |
| | ) | |
| **-vs-** | ) | |
| | ) | |
| **CUYAHOGA FALLS GENERAL** | ) | **PLAINTIFFS  RESPONSE TO THE** |
| **HOSPITAL, et al.,** | ) | **DEFENDANTS  MOTION TO DISMISS** |
| | ) | **OR IN THE ALTERNATIVE FOR** |
| **Defendants** | ) | **SUMMARY JUDGMENT,** |
| | ) | **DEFENDANTS  MOTION FOR** |
| | ) | **SUMMARY JUDGMENT AGAINST** |
| | ) | **HOMAN, AND DEFENDANTS** |
| | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT AGAINST SAMSON** |
| | ) | |

Now comes the Plaintiffs, by and through the undersigned counsel, and hereby requests

that this Court, for the reasons stated in the following Memorandum in Support, DENY the

Defendants  Motion to Dismiss or in the alternative for Summary Judgment, Defendants  Motion

for Summary Judgment Against Samson, and Defendants  Motion for Summary Judgment

Against Homan

.

1

Respectfully submitted,

**EDWARD L. GILBERT CO., LPA**

/s/ Edward L. Gilbert
Edward L. Gilbert (0014544)
Attorney for Plaintiff
One Cascade Plaza, Ste. 825
Akron, Ohio 44308
(330) 376-8855
(330) 376-8857 FAX
egilbert@lek.net

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Response was electronically filed on April 9, 2003.  Notice of this filing will be sent to all parties by operation of the Court s electronic filing system.  Parties may access this filing through the Court s system.

/s/ Edward L. Gilbert
Edward L. Gilbert (0014544)
Attorney at Law

2

## TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| Table of Contents | | i |
| Table of Authorities | | ii |
| I. | Statement of the Facts | 1 |
| II. | The Law of Summary Judgment | 9 |
| III. | Retaliation | 10 |
| | A.    Tangible Adverse Employment Action | 10 |
| | B.    Causal Connection | 13 |
| | C.    Pretext | 15 |
| IV. | The Plaintiffs stated claims for retaliation in Case No. 5:02 CV 1738 as well as in case No. 5:00 CV 1326 | 17 |
| V. | Agarwal is a Proper Party in Case No. 5:02 CV 1738 | 18 |
| VI. | Liability against Agarwal for retaliation as a Supervisor under Chapter 4112 | 18 |
| VII. | Hostile Work Environment Based on Gender | 20 |
| | A.    Based on Sex | 20 |
| | B.    Severe or persuasive | 21 |
| | C.    Agarwal was a Supervisor for purposes of Title VII | 24 |
| | D.    Tangible Adverse Employment Action | 26 |
| | E.    Employer Liability for Supervisor Harassment Where There is No Tangible Adverse Employment Action | 26 |
| | F.    Preventing and Correcting Supervisor Harassment | 27 |
| | G.    Liability for Supervisor Harassment | 29 |
| VIII. | Age and Race Discrimination Against Plaintiff Samson | 29 |
| | A.    Adverse Action | 29 |
| | B.    Unequal Treatment | 30 |
| | C.    Pretext | 31 |
| IX. | Hostile Work Environment Based on National Origin | 32 |
| X. | Assault | 32 |

i

XI.     Whistle Blower/Public Policy                                          34

XII.    Intentional Infliction of Emotional Distress                         35

XIII.   Conclusion                                                           35

# TABLE OF AUTHORITIES

**Cases** | **Page**

Bowman v. Shawnee State University
220 F. 3d 456,463 (6th Cir. 2000) — 20-21

Bowser v. Bembro,
34 Ohio L. Abs, 253, 36 N.E. 2d 998 (Ct. App. 1941) — 33

Breaux v. City of Garland,
205 F. 3d 150, 157-58 (5th Cir. 2000) — 12

Burlington Industries, Inc. v. Ellerth,
524 U.S. 742 (1998) — 27

Cehrs v. Northeast Ohio Alzheimer Research Ctr.,
959 F. Supp. 441, 445 (N.D.Ohio 1997). — 16

Celotex Corp. v. Catrett,
477 U.S. 317, 322, 106 S.Ct. 2548 (1986) — 9

Childers v. Slater,
44 F. Supp. 2d 8, 19 (D.C.D.C. 1999) — 11, 13

Dobbs-Weinstein,
185 F. 3d 542, 548 (6th Cir. 1999) — 12

Dowell v. Rubin,
234 F. 3d 1268 (6th Cir., Oct. 31, 2000) (unpublished) — 11

EEOC v. Avery Denison Corp.,
104 F. 3d 858, 861 (6th Cir. 1997) — 14-15

Faragher v. City of Boca Raton,
524 U.S. 775 (1998). — 25-29

Genaro v. Central Transport Inc.,
84 Ohio St. 3d 293, 703 N.E. 2d 782, 787 (1999). — 19, 32

Greeley v. Miami Valley Maintenance Contrs., Inc.
(1990), 49 Ohio St. 3d 228, 551 N.E. 2d 981 — 34, 35

iii

Gribicheck v. Runyon,                                                    11
245 F. 3d 547, 551 (6th Cir. 2001)

Hall v. Baptist Mem l Health Care Corp.,                                 29
215 F. 3d 618, 625 (6th Cir. 200)

Hampel v. Food Ingredients,                                             20-21,
89 Ohio St. 3d 169 (2000)                                               24

Jackson v. City of Columbus,                                            12
194 F. 3d 737, 752 (6th Cir. 1999)

Jacobs v. Village of Ottawa Hills,                                      33
111 F. Supp. 2d 904, 918 (N.D. Ohio 2000)

Kulch v. Structural Fibers, Inc.,                                       35
78 Ohio St. 3d 134 (1997)

Luckman v. UPS,                                                         11
No. 3:00 CV 0739-G, 2001 U.S. Dist. LEXIS
13555 at *18-9 (N.D. Tex. 2001)

MacNeil v. Case Western Reserve University,                             35
105 Ohio App. 3d 588, 594 (1995)

Manzer v. Diamond Shamrock Chemicals Co,                                16
29 F. 3d 1078, 1084 (6th Cir. 1994)

McCormick v. Kmart Distribution Center,                                 19
163 F. Supp. 2d 807, 822 (N.D. Ohio 2001)

McDonnell Douglas Corp. v. Green,                                       31
411 U.S. 792 (1973)

McGarity v. Mary Kay Cosmetics,                                         11, 13
No. 3:96 CV 3413 - R, 1998 U.S. Dist. LEXIS
1150 at *12 (N.D. Tex. 1998)

McKethan - Jones v. Ohio Dep t of Health,                               11
7 Fed Appx. 475, 479 (7th Cir. 2001)

iv

Myart v. Doubletree Hotels Corp.,                                           11, 13
No. 3:20-352, 2002 U.S. Dist. LEXIS 720
at *13-14 (N.D. Ill. 2002).

Noble v. Brinker Int l Inc.,                                                25
175 F. Supp. 2d 1022, 1042 (S.D. Ohio 2001)

Pierce v. Commonwealth Life Ins. Co.,                                       25
40 F. 3d 796, 803 (6th Cir. 1994)

Prickett v. Amoco Oil Co,                                                   12
147 F. Supp. 2d 1147, 1158 (D. Utah 2001)

Reamsnyder v. Jaskolski,                                                    35
10 Ohio St. 3d 150 (1984)

Rose v. Buckeye Telesystem, Inc.                                            13
181 F. Supp. 2d 772, 776 (N.D. Ohio 2001)

Russell v. Board of Trustees,                                               13
243 F. 3d 336, 341 (7th Cir. 2001)

Talley v. Bravo Pitino Restaurant, Ltd.,                                    10
61 F.3d 1241, 1245 (6th Cir.1995).

Wade v. Knoxville Utilities Board,                                          10
259 F.2d 452, 463 (6th Cir. 2001)

White v. Burlington Northern & Santa Fe Railroad Co.,                       12-13
310 F. 3d 443, 454 (6th Cir. 2002)

Wiles v. Medina Auto Parts,                                                 35
96 Ohio St. 3d 240(2002)

Williams v. General Motors Corp.,                                           20-29
187 F. 3d 553, 561 (6th Cir. 1999).

**Statutory Authority**

RC Chapter 4112                                                             17-19,
                                                                            32

R.C. 4112.01(A)(2)                                                          18-19

v

R.C. 4113.52                                                           34

Title VII                                                          10, 17
                                                                   22-25

31 U.S.C. §3729                                                        34

42 U.S.C. §2000e(b)                                                24-25

**Exhibits**

A.      Deposition Excerpts of Agarwal

B.      Deposition Excerpts of Anthony

C.      Deposition Excerpts of Weber

D.      Deposition Excerpts of Samson

E.      Deposition Excerpts of Homan

F.      Deposition Excerpts of Bertter

G.      Affidavit of Homan

H.      Deposition Excerpts of Tomlinson

I.      Deposition Excerpts of Haynes

J.      Deposition Excerpts of Anderson

K.      Deposition Excerpts of Shadwick

L.      Summa Health System s Reduction Elimination Policy

M.      Expert Reports of Harvey S. Rosen and John F. Burke, Jr.

N.      Dowell v. Rubin, 234 F. 3d 1268 (6th Cir., Oct. 31, 2000)

O.      McGarity v. Mary Kay Cosmetics, No. 3:96 CV 3413 - R, 1998 U.S. Dist. LEXIS 1150 at
        *12 (N.D. Tex. 1998)

P.      Luckman v. UPS, No. 3:00 CV 0739-G, 2001 U.S. Dist. LEXIS 13555 at *18-9 (N.D.

Tex. 2001)

Q.      <u>Myart v. Doubletree Hotels Corp</u>., No. 3:20-352, 2002 U.S. Dist. LEXIS 720 at *13-14
        (N.D. Ill. 2002).

<u>**MEMORANDUM IN SUPPORT**</u>

**I.     <u>Statement of the Facts</u>**

Defendant Doctor Agarwal ( Agarwal ) has been the clinical director of the laboratories at Cuyahoga Falls General Hospital since 1975  (Agarwal s depo, attached hereto as Exhibit A, at 29-32, 105-106).   Although Agarwal s employment status is classified as an independent contractor, he is required to follow the rules, policies, and procedures of the hospital (Agarwal 49-51, 119, Anthony s depo., attached hereto as Exhibit B, at 165; Weber s depo., attached hereto as Exhibit C, at 35, 50-51).   Dr. Agarwal is also a member of the hospital board of trustees and has served as the treasurer and chairman of the board (Agarwal 29-32, 210-211, Anthony 206-209).   Agarwal s responsibilities at the hospital, as director of the lab, include supervising employees and performing in an advisory capacity in the hiring and firing of employees  (Agarwal 49-51, Weber 40-43).   Throughout Plaintiff Samson s employment she believed Agarwal had the authority to fire her. (Samson s depo., attached hereto as Exhibit D, at 60-61). He repeatedly told her he was her boss. (Id.).

Starting in 1993 or earlier, Agarwal began touching his groin when he spoke to Plaintiff Samson and when he was in her presence (Samson 150-151). Likewise, Dr. Agarwal would repeatedly place his hand on the outside of his pants, over his fly and fondle his groin when Plaintiff Homan was present (Homan s depo. attached hereto as Exhibit E at 38-39).   Dr. Agarwal would repeatedly zip and unzip his pants in front of the Plaintiffs  (Homan 61-62, Samson 173).  This zipping and unzipping would occur in the hallway or within the histology area when the Plaintiffs were in close proximity. (Homan 53-54).   Agarwal would speak to Plaintiff Homan outside of the restroom or as he walked by with his pants unzipped.  (Homan 47-

1

52). Plaintiff Samson was also present when Agarwal would unzip his pants and  move his hand around his pants before reaching the restroom  (Samson 173).  On more than one occasion, Plaintiff Samson observed Agarwal urinating with the restroom door open as she walked down the hallway (Samson 186-187).

Both Plaintiffs have seen Agarwal in various states of undress while working at the Hospital (Samson 195, Homan 59).  Frequently, Defendant Agarwal would put his leg on the desk and pull his pant leg up, pull his socks down and scratch his leg while the Plaintiffs were in his office (Id.).  In the presence of the Plaintiffs, Defendant Agarwal often unbuttoned his dress shirt to his waistline exposing his undershirt (Id.).  The Plaintiffs also saw Defendant Agarwal with his socks and shoes off while he was working at the Hospital (Id.).

Dr. Agarwal made frequent, unwanted bodily contact with the Plaintiffs.  In approximately 1992, Agarwal called Plaintiff Samson into his office and gave her a check purporting to be a Christmas bonus and asked her for a hug (Samson 142).  Agarwal continued this practice of giving checks and asking Plaintiff Samson for a hug every year until 1997, when she began reporting his sexual harassment to management (Samson 146). Similarly, Agarwal hugged Plaintiff Homan on two occasions (Homan 80-86).  The first unwelcome hug occurred in December 1996, when Agarwal gave Plaintiff Homan a Christmas bonus check and he wrapped his arms around her  (Id.).  Defendant Agarwal hugged Plaintiff Homan a  second time in December of 1998 in the gross room.  (Homan 88-91). Defendant Agarwal also asked for and gave hugs to secretaries and other histologists (Bartter s depo., attached hereto as Exhibit F, at 110-111, 126-127, Agarwal 224-227).

During gross dissection, Plaintiff Homan was required to stand close enough to Agarwal

2

to hand him tools (Agarwal 157-158, Homan 95-97).   Agarwal, however,  required Homan to stand within a foot and a half of him (Homan 95-97).  This was much closer that most pathologists required their histotechs to stand (Id.).  Furthermore, Agarwal did not require any other of his other assistants to stand within a foot and a half of him (Homan 99).  When Homan tried to distance herself from Agarwal, he would tell her to move closer  (Id.).   In addition to requiring Plaintiff Homan to stand very close to him during gross dissection, Defendant Agarwal frequently bumped and brushed her in a sexual nature.  (Homan 93-95, 101-102).   Defendant Agarwal made Plaintiff Homan put his apron over his head while facing her (Homan Affidavit, attached hereto as Exhibit G).  Defendant Agarwal would then turn around and tell her to tie the apron around his waist, forcing her to reach around his body (Id.).

Defendant Agarwal has made inappropriate sexual comments to both Plaintiff Samson and Plaintiff Homan (Homan 112-113).  Defendant Agarwal asked Plaintiff Homan when she was  going to run off and have babies and leave him , whether  she slept on a mattress or a waterbed  and  what happened to her face.  (Homan 117-122, Homan Affidavit).  In the gross room, Defendant Agarwal asked Plaintiff Homan,   which way the hair grows on her breasts   in front of a resident.  (Homan 128-129).  Defendant Agarwal would stare at Plaintiff Homan s breasts and comment on how good she looked and inquire whether she had lost weight (Homan 132-135, 145-147).   Agarwal made similar comments to Plaintiff Samson regarding her physical appearance, such as asking her to turn around so he could see how she looked that day (Samson 174).  Defendant Agarwal also inappropriately inquired into Samson s personal life by asking whether or not she had a boyfriend (Id.)  Defendant Agarwal made sexist jokes in the presence of both Plaintiffs (Samson 181).

3

Dr. Agarwal is frequently verbally abusive to both Plaintiffs (Homan 74-75, Samson 230) He regularly spoke to Plaintiff Homan in threatening and aggressive tones and made false accusations about her, which he circulated among the hospital administration and staff (Homan 74-75.).  On one occasion, Dr. Agarwal  called Ms. Homan a liar in front of hospital employees. (Id.)  Plaintiff Homan grew fearful of Agarwal (Bartter119-121).  Similarly, Defendant Agarwal frequently humiliated Plaintiff Samson (Samson 231).   Defendant Agarwal demeaned Plaintiff Samson in front of her employees by making remarks about her performance and yelling at her in hostile, threatening tones (Id.).

 Plaintiff Homan verbally reported Agarwal s groping to her immediate supervisor, Cheryl Steigerwald, Dr. Agarwal s executive secretary Melanie Gibbons, Larry Ward, microbiology supervisor, and Val Vitarella, hematology supervisor (Homan 27-29, 36-37, 153-154).  Likewise, Plaintiff Samson began reporting Defendant Agarwal s sexual harassment to Norma Tomlinson in 1997 (Samson 241).  At the Hospital, Norma Tomlinson ( Tomlinson ) was employed as Vice President of Patient Care Services and also supervised the laboratory (Tomlinson depo., attached hereto as Exhibit H, at 20).  Plaintiff Samson telephoned Tomlinson to inquire if they could have a one on one conversation about issues with Defendant Agarwal (Samson 241-242)  Tomlinson brushed Plaintiff Samson off and never agreed to make time to meet with them (Id.)    Plaintiff Samson and Plaintiff Homan also attempted to report Defendant Agarwal s misconduct to the compliance officer, Denise Haynes ( Haynes ) (Samson 245-246). Haynes then brought the Plaintiffs to Dr. George (Id.).  Dr. George, Plaintiff Homan, Plaintiff Samson, Haynes and Tomlinson met in Dr. George s office to discuss the Plaintiffs  problems with Dr. Agarwal (Samson 248-249).  Dr. George assured the Plaintiffs that he would take care

4

of the situation (Id.).

Despite the Plaintiffs  repeated efforts to report Agarwal s misconduct, the situation persisted.  The Plaintiffs then followed hospital procedure in the policy handbook, which states that sexual harassment issues should be reported to human resources (Anthony 82, Homan 80). The sexual harassment policy further states that all claims will prompt an investigation (See Haynes  depo., attached hereto as Exhibit I at 33).  In accordance with hospital policy, Plaintiff Homan spoke with Shirley Shadwick ( Shadwick ), Director of HR, and Fred Weber ( Weber ), Vice President of HR regarding the sexual harassment by Agarwal (Homan 62-65).  Weber was responsible for the implementation and administration of the sexual harassment policy at the hospital, which included taking corrective action up to and including termination (Weber 47-49). In December 1998, the Plaintiffs took their concerns to Weber (Homan Affidavit).  Plaintiff Homan wrote letters to Weber on June 13, 1999 and September 14, 1999 complaining of Agarwal s verbal abuse and inquiring when an investigation was going to be taken (Weber 104-106).  The hospital claims that Fred Weber conducted a thorough investigation of Plaintiff Homan s workplace concerns beginning in the Fall of 1999 (Anthony 26). In reality, Weber told Plaintiff Homan that  harassment is in the eyes of the beholder,  and that she could not be harassed by Agarwal because he was not an employee of the hospital (Id.).  After Weber summarily dismissed Plaintiff Homan s complaint, she wrote him a letter addressing additional issues (Homan 65).

On November 2, 1999, the Plaintiffs met with hospital counsel, Thomas Crookes and Shawn Lyden of Brouse McDowell, to address issues of the investigation (Anthony 126-128, Samson 244-245).   Subsequently, the hospital determined that two investigations would be

5

conducted by outside sources to determine the appropriateness of Agarwal s clinical processes and workplace harassment issues (Anthony 128-129).  An independent pathologist from Michigan and Michelle Anderson from Stow, Ohio, were retained and paid for by Brouse McDowell (Anthony 131, 152).  The pathologist determined that Agarwal was performing his medical duties in an appropriate manner (Anthony 131-132).

Anderson began her investigation on or about February 11, 2000, when she met with Fred Anthony ( Anthony ) (Anderson s depo., attached hereto as Exhibit J at 50-55).  Fred Anthony gave Anderson the names of the Plaintiffs, Defendant Agarwal, and Norma Tomlinson (Anderson 56-59, Anthony 154).   Brouse McDowell provided Anderson with a  list of the Plaintiffs  issues. (Anderson 56-59, Anthony 154). Anderson met with Plaintiff Homan twice in February 2000 (Homan 103-110). During the first meeting with Plaintiff Homan,  Anderson limited her conversation, did not ask any questions, and expressed her eagerness to get home (Homan 103-110).  Anderson s second meeting with Plaintiff lasted only approximately five minutes (Homan 111). Although Homan told Anderson about Dr. Agarwal s yelling, zipping and unzipping his pants, gifts of money and other concerns, Anderson failed to include these details in her investigative report (Anderson 81-83, 116-117).   Anderson determined that no sexual harassment issues were present regarding the Plaintiffs (Id.).

Similarly on two occasions, Anderson briefly met with Plaintiff Samson (Samson 262-266).  The first meeting lasted approximately forty-five minutes, Anderson focused mainly on Plaintiff Samson s job performance, rather than harassment issues (Id.).  Plaintiff Samson recalls only that the second meeting was very brief (Samson 268).

Anderson delivered her investigative report to Anthony on February 28, 2000 (Anderson

6

158-160).  Anderson provided Attorney Crookes with a communication regarding her investigation that contained details not contained in her investigative report (Anderson 123). Anderson maintained no documents on how she had determined the conclusions of her investigation, nor did she include recommendations to correct the situation between the Plaintiffs and Agarwal (Anderson 124, 158-160).  Further, Anderson never followed up on the results of her investigation (Id.).

As a result of Anderson s alleged  investigation, the hospital implemented a corrective action plan upon the Plaintiffs on March 1, 2000, which stated that failure to comply with the plan would result in termination (Anthony 163-164).  Although Dr. Agarwal also received a corrective action plan, the same termination language included in the Plaintiffs  plans was not used (Anthony 165-166).

On March 9, 2000, Plaintiff Homan filed a charge of discrimination with the Ohio Civil Rights Commission and the EEOC.  Plaintiff Samson also filed a charge with OCRC and EEOC on March 9, 2000 stating that Defendant Agarwal subjected her and other females to unequal treatment by berating them and insulting them (Samson 341-342).  Samson is not aware of Defendant Agarwal treating male employees in the same demeaning manor as he treats the Plaintiffs (Samson 345-346).  Plaintiff Homan filed a second charge with the OCRC and EEOC on May 23, 2000 for retaliation and gender discrimination because she was given more supervisory duties and responsibilities without compensation.

In late summer of 2001, Defendant Agarwal waved a scalpel inches from Plaintiff Homan s face (Anthony 47). Fearful for her life Plaintiff Homan complained. (Id.).

In September 2001, Shadwick became aware that there was a safety issue in the lab with

7

Agarwal (Shadwick s depo., attached hereto as Exhibit K at 50-51). Samson telephoned Shadwick and stated that Homan was fearful of Agarwal and that security was needed in the gross room (Id.).

On October 1, 2001 Cuyahoga Falls General became a member of the Summa Health System (Anthony 11-12) On October 2, 2001, Plaintiff Homan sent a letter to Shadwick, stating that she could no longer perform her job effectively due to the heightened tension with Agarwal (Anthony 180-181, Shadwick 102-103). The letter stated that Agarwal held and waved bloody scalpels with human tissue inches from her face (Shadwick 104-106). Although the hospital s policy and procedure did not provide for an administrative leave of absence, Anthony placed Plaintiffs on administrative leave on October 15, 2001 based solely on his authority as chief executive officer of the hospital(Anthony 76-78). Anthony claims he placed the Plaintiffs on administrative leave because of Homan s October 2, 2001 letter to Shadwick and the general need to keep the Plaintiffs safe (Anthony 23-24, 31-32, 76-78). Plaintiff Samson met with Anthony and Shadwick on October 15, 2001 and she was told that she would be on administrative leave for thirty days (Samson 86-92). Anthony then told Samson and her staff, in a second meeting, that she would be on administrative leave for only two weeks (Id.).

Following this meeting, Shadwick escorted Plaintiff Samson to her office and demanded her office keys (Shadwick 267, Samson 97). Agarwal watched Samson while she packed her belongings (Id.) Shadwick also stood and watched Samson pack (Shadwick 263-264). Shadwick closed the door to Samson s office and watched her leave the department (Samson 96-98). All this made it look like Plaintiff Samson was being terminated, not merely placed on leave. (Samson 86-92) Since Plaintiff Homan was off work on that day, she was not able to collect her

8

personal belongings (Homan Affidavit).  To date, Plaintiff Homan s belongings have not been returned to her (Id.).

Since Plaintiffs have been on administrative leave Samson has been denied the opportunity to attend a professional seminar out-of-town. (Shadwick 117-118) Shadwick has not asked anyone to take or forward calls for the Plaintiffs, or to give the Plaintiffs their messages or mail. (Shadwick 260-261).

Plaintiffs  leave, implemented allegedly so Defendants could  investigate,  continued with no projection of when Plaintiffs could return to work. (Defendants  Motions for Summary Judgment, p. 15 (Homan) and p. 13 (Samson) citing Anthony s dep. at 30-36; Shadwick 274). In fact the leave lasted 15 months, and ended only when Defendants  outsourced  Plaintiffs positions - and only Plaintiffs  positions - in January of 2003 (See Summa Health System s Reduction Elimination Policy, attached hereto as Exhibit L).

Despite the harsh action taken against the Plaintiffs, no action has ever been taken against Agarwal (Anthony 41).   Agarwal continued his duties uninterrupted while the Plaintiffs were on administrative leave (Anthony 41).  Even when Agarwal s contract expired on December 31, 2001, he continued to work at the hospital on a  month to month  basis under the terms of the original contract (Anthony 63).

## II.    The Law of Summary Judgment

Pursuant to Fed. Civ. R. 56, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). Therefore, nonmoving party must subsequently  present

9

evidence that creates a genuine issue of material fact making it necessary to resolve the

difference at trial. In determining whether a genuine issue of material fact exists, the Court must

assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor

of that party.  See Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir.1995).

When there is a substantial dispute on the relevant facts summary judgment is not appropriate.

Furthermore, this Court is not the trier of the facts, this role is solely for the jury.  In this case, the

Defendants are attempting to have this Court weigh the facts which this Court cannot do.

Applying the aforementioned standard, this Court will certainly deny the Defendants

Motion to Dismiss or in the Alternative Motion for Summary Judgment and Defendants

Motions for Summary Judgment because the Plaintiffs  have properly asserted all claims and

there remains a genuine issue of material fact regarding every one of the Plaintiffs  claims.

## III.    **Retaliation**

To demonstrate a prima facie case of retaliation, a plaintiff must show that

(1)     she was engaged in activity protected by Title VII,
(2)     the activity was known to the defendant,
(3)     she was subject to tangible adverse employment action, and
(4)     there is a causal link between the protected activity and the adverse action.

Wade v. Knoxville Utilities Board, 259 F.2d 452, 463 (6th Cir. 2001)

Defendant does not dispute prongs (1) and (2) here. Instead Defendants argue that

Plaintiffs failed to establish their prima facie case of retaliation for lack of (3) tangible adverse

employment action and (4) causal connection.

A.     Tangible adverse employment action

Citing no authority, Defendants assert that  being placed on paid leave  does not

10

constitute a tangible employment loss. In fact, being placed on paid leave may indeed constitute a tangible employment loss, especially where that leave is lengthy; where, when the leave ends, the employee has no job to return to; and where being out of the market for the lengthy duration of the leave makes the employee less attractive to potential employers.

Certainly unpaid leaves or suspensions - even very short ones - constitute adverse employment actions. See, e.g. McKethan - Jones v. Ohio Dep t of Health, 7 Fed Appx. 475, 479 (7th Cir. 2001) (five days); Dowell v. Rubin, 234 F. 3d 1268 (6th Cir., Oct. 31, 2000) (unpublished) (five days); Gribicheck v. Runyon, 245 F. 3d 547, 551 (6th Cir. 2001) (14 days easily  satisfies adverse action). But paid leaves and suspensions may be adverse actions also.

With respect to what constitutes adverse action in the context of allegations of reprisal, ... suspensions with pay ... can be viewed as retaliation [if they] engender some negative consequences with respect to the plaintiff s employment.  Childers v. Slater, 44 F. Supp. 2d 8, 19 (D.C.D.C. 1999) As long as a paid leave or suspension  would tend to deprive  an employee of  opportunities,  or  adversely affect his status,  that paid leave or suspension qualifies as an adverse action. See McGarity v. Mary Kay Cosmetics, No. 3:96 CV 3413 - R, 1998 U.S. Dist. LEXIS 1150 at *12 (N.D. Tex. 1998)

The question is whether the employee suffered any detriment as a result of being out on paid leave or suspension (See Luckman v. UPS, No. 3:00 CV 0739-G, 2001 U.S. Dist. LEXIS 13555 at *18-9 (N.D. Tex. 2001) -  through economic harm or otherwise.  Myart v. Doubletree Hotels Corp., No. 3:20-352, 2002 U.S. Dist. LEXIS 720 at *13-14 (N.D. Ill. 2002).  If so, then a prima facie case of retaliation can be premised on the leave or suspension with pay. See Myart v. Doubletree Hotels Corp. supra.

11

Even a <u>short</u> paid leave a suspension may be an adverse action if there is a termination of employment or loss of benefits. <u>But see e.g. Jackson v. City of Columbus</u>, 194 F. 3d 737, 752 (6th Cir. 1999) (no adverse action because short-term suspension with pay did not result in loss of employment, change in salary, loss of benefits, reduction on hours or material responsibilities); <u>see also eg. Prickett v. Amoco Oil Co</u>, 147 F. Supp. 2d 1147, 1158 (D. Utah 2001) (temporary suspension with pay is not adverse action where benefits ... and job status appear to have been unaffected. ) Here, on the other hand, the Defendants, purporting to investigate, placed Plaintiffs on paid leave for <u>15 months</u>.

In <u>White v. Burlington Northern & Santa Fe Railroad Co.</u>, 310 F. 3d 443, 454 (6th Cir. 2002) (rehearing granted February 11, 2003), the majority identified the genera[l] rule: [T]he employee generally will not suffer a materially adverse action ... <u>[a]s long as the employers ...</u> <u>internal investigati[ve]... process operates in a timely fashion...</u> <u>White, supra</u> (quoting the dissent in <u>Dobbs-Weinstein</u>, 185 F. 3d 542, 548 (6th Cir. 1999) with approval) (emphasis added)

The general rule clearly does not operate here. To the contrary, a 15 month investigation is far from timely. Accordingly, the 15 month paid leave here constituted an adverse action.

<u>White</u> also rests on whether the employee was ever reinstated. <u>White, supra</u>, at 453-54 Did the employee have a job to return to at the end of the paid leave or suspension? If not, that leave or suspension constituted an adverse action. <u>See also e.g. Breaux v. City of Garland</u>, 205 F. 3d 150, 157-58 (5th Cir. 2000) (leave with full pay not an adverse action where followed by return to same job.) Without reinstatement to negate it, a leave or suspension remains an adverse employment decision. <u>See White, supra, at 452</u>.

12

Plaintiffs here were placed on leave, albeit with pay, for 15 months, while Defendants purported to investigate Plaintiffs s claims.  Defendants never reinstated Plaintiffs; to the contrary, Defendants actually  terminat[ed them]  - and only them -  in the interim.  <u>See White, supra</u>, at 454. (Summa Health System s Reduction Elimination Policy, Exhibit L).  And if the employee is  terminat[ed] in the interim,  the  genera[l]  rule - i.e. that  the employee generally will not suffer a materially adverse action  - is  <u>particularly</u> [less likely to be] true.  <u>Id</u>. (emphasis added).

To be an adverse employment action, a paid leave or suspension must  tend to deprive an employee of  opportunities.  <u>McGarity, supra</u>. The paid leave or suspension must have caused the employee to suffer some detriment,  economic ... or otherwise.  <u>Myart, supra</u>; there must be  negative consequences.  <u>Childers, supra</u>.

While Defendants purported to  investigate  here, Plaintiffs suffered through a 15-month leave that ended not in their reinstatement, but in their termination. At the same time, 15 months out of the workforce made them less attractive to prospective employers.  (See Expert Report, attached hereto as Exhibit M) <u>See e.g. Russell v. Board of Trustees</u>, 243 F. 3d 336, 341 (7th Cir. 2001) and <u>Rose v. Buckeye Telesystem, Inc.</u> 181 F. Supp. 2d 772, 776 (N.D. Ohio 2001) (suspension with pay may be an adverse action if it affects future employment opportunities).

Defendants argue that paid leaves cannot constitute adverse employment actions. But this is not true. Instead, the length of the leave, the failure to reinstate, the termination[, and the loss of marketability,] all cumulate make <u>this</u> paid leave a materially adverse employment action.

B.    <u>Causal connection</u>

To establish the element of a causal link[,] the plaintiff is required to  proffer evidence

sufficient to raise the inference that her protected activity was the likely reason for the adverse action. EEOC v. Avery Denison Corp., 104 F. 3d 858, 861 (6th Cir. 1997) (internal cites omitted) At the prima facie stage, th[is] burden is minimal. Id In fact, the causal link element requires merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated. Id.

After Plaintiff filed charges and her first lawsuit, tensions in the lab began to escalate, and Agarwal started threatening Homan with a scalpel. Homan, in fear for her life, begged Defendants for protection on October 2, 2001, and Plaintiff Samson also approached Defendants, on Homan s behalf. When these pleas proved futile, Homan applied for a temporary restraining order on October 10, 2001. (Anthony s 180-81, Shadwick 102-106).

On October 15, 2001,[1] Defendants placed Plaintiffs on administrate leave, allegedly so they could investigate Plaintiffs concerns about their safety. (See the pretext section that follows.) This was an act of retaliation against them for complaining about Agarwal.

Consider the circumstances surrounding this leave. First, Defendants made it look like Plaintiffs were being fired, not put on leave for their own protection. (Samson 86-92). Shadwick escorted Samson to her office, demanded her keys, watched her pack, and made sure she left the department. (Shadwick 267, 263-64.)

Furthermore, Defendants also marginalized Plaintiffs by denying them opportunities both to keep up with their training and to socialize with their peers during the leave. (Shadick 117-

---

[1]While proximity between the protected activity and adverse action is not necessarily dispositive in establishing retaliation, the action Defendants took on October 15 to place Plaintiffs on leave was in direct response to Plaintiffs complaints registered earlier that same month. See e.g. Anthony s depo. at 180-81, Shadwick s depo. at 102-03.

14

118, 120, 260-62) Defendants also kept Plaintiffs on leave for a full 15 months; and terminated their positions - and only their positions - at leave s end. (See Summa Health System s Reduction Elimination Pol  And all the time Defendants kept Plaintiffs on leave,  Agarwal was permitted to keep working uninterrupted. (Anthony 41).

To meet their  minimal  burden to establish causal connection, Plaintiff need merely...establish...that the protected activity and the adverse action were not wholly unrelated. EEOC v. Avery, supra. Plaintiffs rely on the facts set forth above to submit that they have met their burden here to establish causal connection between the protected activity and the adverse action.

Plaintiffs have met all four prongs of their prima facie case of retaliation.

C.    Pretext

Once a plaintiff establishes his prima facie case of retaliation, the defendant can allege a nonretaliatory reason for its actions.  At that point the plaintiff has the opportunity to show that the defendants  allegedly nonretaliatory reason is a pretext.

Dr. Agarwal waved a scalpel in Plaintiff Homan s face and Plaintiff Homan, afraid for her life, complained to Defendants. In response, Defendants placed not just Homan, but also Samson, on leave for 15 months allegedly to  investigate  both their workplace safety concerns.

Defendants claim that they placed Samson on leave because of Samson s own concerns about workplace safety. In support they cite Samson s own deposition at 336-37. But Samson s testimony does not support this conclusion at all. Instead Samson did not link the administrative leave to any recent concerns she had about her workplace safety in her depositions testimony, despite counsel s repeated efforts to have her do so. Id.

15

Furthermore Anthony s deposition belies the conclusion that Samson was placed on administrative leave because of her concerns about her workplace safety. (Anthony 33-36). To the contrary, he admitted in his deposition testimony that Samson s concern for her workplace safety was <u>not</u> the reason he placed her on leave. <u>Id.</u> Significantly, he was unable to identify any change in circumstances since 1999 that might have provided some <u>other</u> justification for his October, 2001, decision to place Samson on leave. <u>Id.</u>

Under <u>Manzer v. Diamond Shamrock Chemicals Co</u>, 29 F. 3d 1078, 1084 (6th Cir. 1994), a plaintiff establishes pretext by showing either that 1)the proffered reason had <u>no basis in fact,</u> 2) the proffered reason <u>did not actually motivate</u> the action, or 3) the proffered reason was <u>insufficient</u> to warrant the action. Ultimately, there must be a  sufficient basis on the evidence for rejecting the [the defendant s] explanation.  <u>Cehrs v. Northeast Ohio Alzheimer Research Ctr.,</u> 959 F. Supp. 441, 445 (N.D.Ohio 1997). See also Defendants  Motion for Summary Judgment against Samson at p. 16.

There is  no basis in fact  here for supporting Defendants  reason for placing Samson on leave.  <u>Manzer, supra</u>. Furthermore, this thorough debunking of Defendants  alleged justification for placing Samson on leave, establishes that this alleged reason  did not actually motivate  placing Homan on leave either. <u>Manzer, supra</u>

Defendants here claim that they placed Plaintiffs on leave  to address and investigate [Plaintiffs] concerns regarding [their] safety.  See Motions for Summary Judgment at 13 (Samson) and 15 (Homan). This leave was supposed to last two weeks by one account, or 30 days by another.  Samson s depo. pp. 86-92. In fact, it lasted 15 months, and in all those 15 months Defendants did nothing to  address and investigate [Plaintiffs ] concerns,  a conclusion

16

Defendants  own statements of the Facts do nothing to belie. And it ended conveniently in

Plaintiffs  termination.

Defendants  allegedly nonretaliatory reason was a pretext here. Defendants did not place

Samson and Homan on leave for 15 months to conduct an investigation into workplace safety

concerns that Samson, at least, did not even have. To the contrary, no investigation even took

place in all that time; instead the investigatee himself, Dr. Agarwal, was permitted to continue

working while Plaintiffs  careers were interrupted. (Anthony 41). Accordingly Plaintiffs have

met their burden of establishing pretext here, and as a result Defendants  Motion for Summary

Judgment on Plaintiffs  retaliation claims must be overruled.

**IV.**   **Plaintiffs stated claims for retaliation in Case No. 5:02 CV 1738 as well as in Case
No. 5:00 CV 1326**

Defendants seek the dismissal of the complaint in Case No. 5:02CV 1738 as duplicative

of the retaliation claims pled in the complaint filed previously in Case No. 5:00 CV 1326. The

first two cases of action in the complaint filed in Case No. 5:02 CV 1738 state claims against

Defendants for retaliation under Title VII and Ohio Revised Code 4112 respectively. The third

cause of action in the complaint filed in Case No. 5:02 CV 1738 states a claim for retaliation

specifically against Agarwal, in his individual and official capacities under Chapter 4112 of the

Ohio Revised Code.

None of these claims is duplicative of the retaliation charge previously filed. To the

contrary,  [i]t is common practice for plaintiffs to file a separate action  alleging retaliation,

subsequent to their filing of their  initial complaint.  Docket No. 11, Case No. 5:02 CV 1738,

order of January 24, 2003, at p. 5. This is so because retaliation, or additional retaliation,

17

necessarily  arises after the events alleged in the initial complaint. Id.

Defendants  Motion to Dismiss, as duplicative, the first three counts of the complaint filed in Case No. 5:02 CV 1738, should therefore be overruled.

**V.    Agarwal is a proper party in Case No. 5:02 CV 01738**

According to Defendants, the Court s previous determination in Case No. 5:00 CV 1326 that  Dr. Agarwal [b] not a proper party to this lawsuit,  justifies Rule 12(B)(6) dismissal of Case No. 5:02CV01738 under the doctrine of collateral estoppel. In fact, the reason why the Court in 5:00 CV 1326 determined that Dr. Agarwal was not a party  party in interest  was because Plaintiffs  failed to allege specifically that Dr. Agarwal is liable in his official capacity pursuant to Chapter 4112 of the Ohio Revised Code.   Docket #86, Order of November 21, 2001, at p. 6.  With that defect now cured (see complaint paragraph 43:  Plaintiffs sue Agarwal in his individual and official capacity under 4112 of the Ohio Revised Code ) the complaint in 5:02CV1738 states claims for retaliation against Defendant Agarwal as a proper party under Chapter 4112.

Collateral estoppel does not apply here. Defendants  Motion to Dismiss the Complaint should be overruled, as the complaint states claims against Agarwal as well as the hospital and Summa as proper parties.

**VI.    Liability against Agarwal for retaliation as a Supervisor under Chapter 4112**

Defendants argue in their Motion to Dismiss (pp. 9-12) that Dr. Agarwal was not a  supervisor  for purposes of Chapter 4112 of the Ohio Revised Code. If Dr. Agarwal was indeed not a supervisor, then he cannot be held liable for retaliation as an employer under Chapter 4112.

Ohio Rev. C. §4112.01(A)(2) defines an employer as  any person acting directly or

18

indirectly in the interest of the employer.   Supervisors  maybe liable as  employers  under 4112.01(A)(2) and may be held personally liable. Genaro v. Central Transport Inc., 84 Ohio St. 3d 293, 703 N.E. 2d 782, 787 (1999).

The term  supervisor  is interpreted  expansive[ly].   McCormick v. Kmart Distribution Center, 163 F. Supp. 2d 807, 822 (N.D. Ohio 2001) Even  limited  (sic) supervisory authority  - i.e. supervisory authority that has  no economic effect on the plaintiff     suffices to make an individual a  supervisor  under Chapter 4112. See, e.g. McCormick, supra, at 822 (individual defendant had no authority to hire, fire, discipline, transfer, or promote, yet was still deemed a  supervisor  under Chapter 4112.)

Dr. Agarwal was the director of the lab. For example, he told Plaintiff Samson he was her boss with authority to fire her and she believed him: after all, he supervised the lab employees, participated in their performance reviews, and advised in hiring and firing of staff. (Agarwal 49-51, Weber 40-43; Samson 60-61).  Indeed , when Dr. Agarwal decided he did not want Samson working in pathology, he removed her from her duties as supervisor of the pathology department. (Samson 121).

Agarwal was a supervisor under Chapter 4112. He served in a supervisory position; and he exercised significant control over the plaintiffs  hiring, firing, or conditions of employment; or at least participated or recommended such actions. He certainly exercised the  limited supervisory authority (i.e. supervisory authority without authority to hire, fire, discipline, transfer or promote or supervisory authority that has no economic effect on a plaintiff.) That made him a supervisor for purposes of Chapter 4112.  He may therefore be found personally liable for retaliation.

19

**VII.**　　**Hostile Work Environment Based on Gender**

In order to establish a claim of hostile environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome (which Defendants do not dispute here) (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect  terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,   and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. Hampel v. Food Ingredients, 89 Ohio St. 3d 169 (2000) at Syll. par. 2; Williams v. General Motors Corp., 187 F. 3d 553, 561 (6th Cir. 1999).

A.　　Based on Sex

There are several different ways to establish that  harassment was based on sex.  There may be evidence of conduct that has an explicitly  sexual element  (see Hampel at 178); and there may be evidence of conduct that is instead  facially neutral.  Id at 179 Either or both kinds of conduct can support a claim for hostile workplace sexual harassment, if it would not have been directed at a plaintiff but for her sex. Bowman v. Shawnee State University 220 F. 3d 456,463 (6th Cir. 2000)

This case features both kinds of evidence. On the one hand, Agarwal repeated engaged in the following explicitly sexual or sexually vulgar conduct:

-　　　　unbuttoned his shirt
-　　　　zipped and unzipped his pants
-　　　　touched and fondled his groin
-　　　　urinated with the door open
-　　　　ordered Homan into unnecessary close contact

20

- bumped and brushed up against her
- stared at her breasts
- hugged Samson
- asked plaintiffs questions and speculated aloud about their personal lives (e.g. whether Samson had a boyfriend; which way the hair grew on Homan s breasts)

On the other hand, Agarwal also repeatedly engaged in the following  facially neutral  conduct:

- yelled at plaintiffs in a hostile and threatening tone
- made false accusations against Homan
- demeaned Samson in front of her employees.

Furthermore, on several occasions he actually brandished a scalpel in Homan s face. (Samson 142, 146, 150-51, 173-74, 181, 186-89, 195, 230-31, Homan 38-39, 47-54, 61-62, 74-75, 80-86, 88-91, 93-97, 99, 101-02, 112-13, 117-22, 128-29, 132-35, 145-47, Homan s affidavit).

Defendants argue that Agarwal s conduct was not based on sex. But Agarwal engaged in explicitly sexual conduct or vulgarity; and  explicitly sexual conduct or vulgarity may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender.  See Hampel, supra (internal citation omitted) Furthermore, Agarwal also engaged in facially neutral abuse; and  abusive sex-based conduct is frequently...facially neutral.  Id. Either kind of evidence, alone, may suffice; but when both types of evidence  combin[e]  as they do in this case, that evidence may raise an inference that  gender was the motivating impulse. Cf. Bowman, supra., at 464 (internal reference omitted)

Plaintiffs raised that inference here. Defendant harassed Plaintiffs; and that harassment was based on sex.

B.    Severe or Pervasive

To determine whether alleged harassment is sufficiently severe or pervasive, a court must

21

consider the totality of the circumstances. <u>Williams v. General Motors Corp.</u>, 187 F. 3d 553, 562
(6th Cir. 1999). If instead  the complaints are broken into their theoretical component parts, each
claim is more easily dismissed.  <u>Id.</u>   A holistic perspective is [therefore] necessary [because] the
impact of the separate incidents may accumulate, and ...the work environment created thereby
may exceed the sum of the individual episodes.  <u>Id</u> at 563 (internal cite omitted.)

The Course of Appeals in <u>Williams</u> reversed the lower court s award of summary
judgment, finding that  the alleged incidents [of sexual harassment in that case], seen in context,
create[d] a material issue of fact as to whether the conduct was sufficiently severe or pervasive to
give rise to a violation of Title VII  <u>Id</u>. at 558 To give the full favor of Williams  allegations -
which the District Court dismissed as  infrequent...incidents, not severe, not threatening or
humiliating, but merely offensive  (see <u>Williams, supra</u>, at 561)   Plaintiffs recount them all
here:

1.    A coworker named Giovannoe constantly used the  f-word.

2.    In June, 1995, Plaintiff heard Giovannoe say  Hey Slut.

3.    On one occasion July, 1995, Plaintiff s supervisor Ryan looked at Plaintiff s
      breasts and said (a)  You can rub up against me anytime ; (b)  You would kill me
      Marilyn. I don t know if I could handle it, but I d die with a smile on my face.

4.    A few days later, Ryan came up behind Plaintiff when she was bent over and said
       Backup; just...back right up to me.

5.    Later in July, Ryan came up behind Plaintiff when she was writing the company s
      name. He put his arm around her neck, leaned his face against hers and said  you
      left the dick out of the hand,  i.e., in Handcock.

6.    Workers  conspired  against her. She had to take night shift even though
      Giovannoe originally agreed to do so.

7.    In September, someone glued a box of forms to her desk.

8.     Later that day, Plaintiff heard Giovannoe say  I m sick and tired of these fucking women.  The incident escalated into a verbal altercation between them, and Giovannoe threw boxes, one of which grazed but did not hurt her.

9.     Plaintiff complained she was denied overtime.

10.    Plaintiff complained she was the only person denied a key.

11.    Plaintiff complained she was the only person denied a break.

12.    Plaintiff complained she had to sit in the back.

13.    She once found a cart blocking the other carts and had to find a co-worker to help her move it.

14.    Once a female co-worker padlocked the entrance while plaintiff was inside.

15.    On several occasions her alternative access was blocked.

The Sixth Circuit conceded that  no single episode crosses the Title VII threshold.  Id at 564. But under the totality of the circumstances test, a rational trier of fact could conclude that Plaintiff was subjected to a hostile work environment. Id.

To reach this conclusion, the court focused  first  on the incidents (labeled 3-5 above) of supervisor harassment.  These incidents, which must be taken as fact for purposes of summary judgment, were not merely crude offensive and humiliating, but also contained an element of physical invasion,  the Court concluded. Id. at 563

The Court considered also  the threatening language  and the pranks (which Defendants tried to dismiss as  merely oafish behavior. ) (Compare Defendants  attempts here to characterize Agarwal s behaivor as  boorish[ness] . See Motions for Summary Judgment at 11 (Homan) and 8 (Samson).  [S]een as part of the  constellation of surrounding circumstances, ... the pranks...threatening language, and sexually aggressive innuendo from a supervisor, could

23

well be viewed as work-sabotaging behavior that creates a hostile work environment.   Id. at 563-64.

Williams controls here. If the Sixth Circuit was willing to find that the facts in Williams, analyzed under a totality of the circumstances test, might establish sufficiently severe or pervasive harassment, how much more willing would the court be here, given Agarwal s even more offensive conduct? (For an evaluation of this conduct, please see the section above entitled  based on sex )

Taken as a whole, Plaintiffs  allegations, like Williams , raise a question as to whether they were subjected to harassment severe or pervasive enough to constitute a hostile work environment. Because the severity and pervasiveness of the harassment cannot be determined as a matter of law, summary judgment may not be granted in Defendants  favor on Plaintiffs hostile work environment claim.

C.     Agarwal was a supervisor for purposes of Title VII

In their Motions for Summary Judgment (Homan p 11, Samson, p 8) Defendants argue that Dr. Agarwal was not a  supervisor  for purposes of Title VII. If Agarwal was indeed not a  supervisor,  his employer may be found liable only under a  heightened standard  for co worker harassment.[2] Williams, supra at 561. Understandably, Defendants seek protection under this  heightened standard.  But Agarwal in fact was a  supervisor  under Title VII.

42 U.S.C. §2000e(b) defines employer as  any agent of ... a person engaged in an industry

_____

[2]Agarwal was a supervisor. But even if he were not, Defendants would still be liable because,  through [their] agents or supervisory personnel,...they...knew or should have known of the harassment and failed to take immediate and appropriate corrective action.  See Hampel, supra; Williams, supra, at 561

24

affecting commerce who has fifteen or more employees.    Agent,   in turn, is interpreted as (1)
an individual who   serves in a supervisory position and exercises significant control over the
plaintiff s hiring, firing, or conditions of employment   Pierce v. Commonwealth Life Ins. Co., 40
F. 3d 796, 803 (6th Cir. 1994); or (2) someone who    at least participate(s) in or recommend(s)
such actions.   See Noble v. Brinker Int l Inc., 175 F. Supp. 2d 1022, 1042 (S.D. Ohio 2001)
(internal cite omitted)

     Dr. Agarwal was the director of the lab. For example, he told Plaintiff Samson he was her
boss with authority to fire her and she believed him: after all, he supervised the lab employees,
participated in their performance reviews, and advised in hiring and firing of staff. (Agarwal 49-
51, Weber 40-43; Samson 60-61).  Indeed, when Dr. Agarwal decided he did not want Samson
working in pathology, he removed her from her duties as supervisor of the pathology department.
(Samson 121).

     Agarwal was a supervisor under Title VII. He served in a supervisory position; and he
exercised significant control over the plaintiffs  hiring, firing, or conditions of employment; or at
least participated in or recommended such actions. Therefore, he was a supervisor for purposes
of Title VII. Pierce, supra; Noble,supra

     Accordingly, Defendants  Motions for Summary Judgment insofar as they deny that
Agarwal was a supervisor should be denied. He was a supervisor for purposes of Title VII and
can therefore confer automatic vicarious liability on Defendants under Faragher v. City of Boca
Raton, 524 U.S. 775 (1998).

     If Agarwal was a supervisor; and if the harassment requested in a tangible adverse
employment action, Defendants  liability as an employer is  automatic.  Williams, supra at

ftnote 2. To escape such automatic liability, Defendants deny that Agarwal was a supervisor (an argument Plaintiffs disposed of above) and deny that the harassment resulted in a tangible adverse employment action.

D.    Tangible Adverse Employment Action

Plaintiffs suffered a tangible adverse employment action here, for all the reasons set forth above in the retaliation section of this brief under  tangible adverse employment action, incorporated herein by reference.

For the sake of argument, however, Plaintiffs will address alternative scenarios to establish that even if Plaintiffs had not suffered an adverse employment action, Defendants would still be liable for Agarwal s harassment here.

E.    Employer liability for supervisor harassment where there is no
      tangible adverse employment action

Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) provides an affirmative defense to employers where no tangible adverse employment action has taken place. That affirmative defense is available where (1) the employer has exercised reasonable care to prevent and correct sexually harassing behavior by the supervisor; and (2) the plaintiff has not unreasonably failed to take advantage of preventive and corrective opportunities provided by the employer.

Defendants do not seriously dispute that Plaintiffs repeatedly took advantage of every opportunity to complain about, and beg Defendants to prevent and correct, Agarwal s behavior here. Accordingly Plaintiffs concentrate herein on responding to Defendants  claim that they are entitled to the Faragher affirmative defense because they exercised reasonable care to prevent and

26

correct reported conduct.

     F.    <u>Preventing and Correcting Supervisor Harassment</u>

 Employers now have an <u>affirmative duty</u> (sic) to prevent workplace harassment by supervisors.  <u>Williams, supra</u>, at 561, construing <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998) and <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998) Even in cases where an employee fails to establish that he suffered an adverse employment action,   the employer can escape liability <u>only</u> if it took reasonable care to <u>prevent and correct</u> (sic) sexually harassing behavior.  <u>Id</u> (emphasis of  only  added.) Since Defendants did not take reasonable care to prevent and correct sexually harassing behavior here, they cannot escape liability.

A review of some of Defendants  numerous failures to prevent and correct the harassment here will suffice to establish Defendants  failure to meet the  prevent and correct  element of the <u>Faragher</u> affirmative defense:

    1.    Tomlinson refused Plaintiff Samson s requests to meet with Plaintiffs to discuss the complaints about Agarwal. See Samson s dep. at 241-42

    2.    Dr. George assured Plaintiffs he would remedy Plaintiffs  problems with Agarwal but in fact did nothing. See Samson s depo. at 248-49

    3.    Instead of  investigating  Ms. Homan s complaints as Defendants claim he did (Anthony s dep. at 26), Fred Weber told Plaintiff Homan that  harassment is in the eyes of the beholder  and that she could not have been harassed by Agarwal because he was not an employee of the hospital. Id.

    4.    Anderson allegedly  investigated.  In fact:

        a.    Anderson met with Plaintiff Homan twice. In the first meeting, Anderson did not ask any questions and expressed her eagerness to get home. Homan s dep. 103-110; and the second meeting lasted only about five minutes. Homan at 111. Although Homan told Anderson about Agarwal s yelling, zipping and unzipping his pants, gifts of money for hugs and other concerns, Anderson failed to include these details on her alleged

27

investigative report Anderson s dep. at 81-83, 116-117.

b.      Anderson met twice with Samson as well. The second meeting was very brief (Samson s depo. at 268); and while the second meeting lasted 45 minutes, Anderson focused mainly on Samson s job performance rather than the harassment. Samson s dep. at 262-266.

c.      Anderson submitted a report of her alleged investigation, but made no recommendations on how to correct the situation between Plaintiffs and Agarwal. Anderson s depo. at 124, 158-60. In addition, Anderson never followed up on the results of her alleged investigation. <u>Id.</u>

5.      Defendants purported to implement a corrective action plan on Samson, Homan, and Agarwal on March 1, 2000. Homan s and Samson s plans stated that failure to comply would result in termination. Anthony s depo. at 163-64. Agarwal s plan, in contrast, contained no such language. Anthony s depo. at 165-66.

6.      In response to Plaintiff Homan s complaints about Agarwal s waving a scalpel in her face, Defendants placed <u>both</u> Plaintiffs on  administrative leave  in order to  investigate.   See Anthony s depo. pp 30, 32; see also Motion to Dismiss p. 15.

a.      This leave lasted a full 15 months, during which time Dr. Agarwal, the investigatee, was permitted, in contrast to Plaintiffs, to continue working uninterrupted. Anthony s dep. at 41. Even when Agarwal s contract expired on December 31, 2001, he continued to work at the hospital on a month-to-month basis of his original contract. Anthony s dep. at 63.

b.      As for Plaintiffs, their 15 month  administrative leave  in fact produced no  investigation  at all. (This fact is inferentially corroborated by Defendants  failure to provide any evidence to the contrary.) Plaintiffs 15 month leave instead ended in the termination of their employment. Shadwick s affidavit, attached to Defendants  Motions for Summary Judgment, at paragraph 9.

<u>Faragher</u> imposes an affirmative duty on employers to prevent and correct harassment by supervisors where no adverse employment action has taken place.  The facts above preclude concluding as a matter of law that Defendants here took reasonable care to prevent and correct Agarwal s behavior.

Defendants did not take reasonable care to prevent and correct supervisor harassment.

Furthermore, Plaintiffs certainly did not unreasonably fail to take advantage of the preventative and corrective opportunities provided by their employer to complain and beg for relief. Accordingly, Defendants here are not entitled to the affirmative defense offered by <u>Faragher</u>. Defendants are instead liable for Agarwal s harassment in this case.

        G.      <u>Liability for Supervisor Harassment</u>

Defendants here are  automatically  liable here (<u>See Williams, supra</u>): Agarwal was a supervisor; and Plaintiffs suffered a tangible adverse employment action. Alternatively even if Plaintiffs did not suffer an adverse action, Defendants failed to establish their affirmative defense. Accordingly, Defendants  Motion for Summary Judgment on Plaintiffs  hostile work environment claim should be overruled.

**VIII.**  <u>**Age and Race Discrimination Against Plaintiff Samson**</u>

A plaintiff may establish a prima facie case of race and/or age discrimination with evidence that 1) she is a member of a protected class, 2) she was qualified for a position 3) she was subject to adverse employment action 4) she was treated less favorably than similarly situated employees outside the protected class. <u>Hall v. Baptist Mem l Health Care Corp</u>., 215 F. 3d 618, 625 (6th Cir. 200) Defendants argue that Ms. Samson cannot establish 3 and 4 above, and they argue that she cannot establish that Defendants  allegedly legitimate nondiscriminatory reasons were a pretext for race or age discrimination.

        A.      <u>Adverse Action</u>

Plaintiff Samson was placed on an administrative leave that lasted 15 months, produced no  investigation  (which was the alleged reason for the leave), and resulted in her termination/constructive discharge. For all the reasons set forth above under the section  tangible

29

adverse employment action  under  retaliation  incorporated herein by reference, this leave constituted an adverse action.

       B.    <u>Unequal Treatment</u>

Despite Plaintiff Samson s extensive experience, she has never been offered a director s position at the hospital. (Samson 282). Because of her age and ethnicity, Samson was denied, for example, the opportunity to bid for the position of Director of Radiology and Cardiology. Instead this position, never posted, went to Ann Ziegler, a younger, Caucasian, and less educated employee. (Samson 280-81, 271-272).   Plaintiff Samson was also denied the opportunity to bid on the additional department that was given to Rick Hohan in 2001 (Samson 28).

 Plaintiff Samson was also discriminated against based on her age and national origin in the unequal treatment she received compared to other managers.  Samson was forced to take work home because Agarwal and Tomlinson put demands on her that they didn t put on other managers. (Samson 316).  Tomlinson disciplined Samson and performed evaluations on her based on unfounded allegations and Agarwal s input (Samson 274-275, 279).  Plaintiff Samson was written up and threatened with termination; while other younger, Caucasian managers with identical issues such as Carol Jean Mazza  were not disciplined at all. (Id.).  Mazza, Director of Material Management, was reported to human resources several times by employees complaining of her mistreatment and managerial skills (Id.).   Ann Zeigler, a younger, Caucasian director, reported to Samson that she has had confrontations with Denise Haynes (Samson 275-276). Tomlinson spoke to Zeigler about these incidents, however, Zeigler was never written up or given corrective action (Id.).

Furthermore, Samson was isolated based on her age and ethnicity. She was regularly

30

excluded from task force meetings even when her expertise was required. (Samson 272-73).   She

was not invited to the task force meetings regarding  affiliation of Summa and the

preauthorization committee meeting. (Samson 285-288).  She was isolated in the projects she

was assigned, e.g. the donor collection project, which she discovered was not being seriously

considered despite the work she was required to devote to it. (Samson 316).

While harsh actions were taken against Plaintiff Samson, no action has ever been taken

against Agarwal. (Anthony 41). The corrective plans implemented in March, 2000 threatened

Samson with termination, but not Agarwal. (Id.). Even when Agarwal s contract expired on

December 31, 2001, he continued to work on a month to month basis under the terms of the

original contract. (Id.).

The facts alleged above establish that Plaintiff Samson was treated less favorably than

similarly situated employees outside her protected classes of age and national origin.

C.    Pretext

Once a plaintiff establishes a prima facie case of age or race discrimination, as Plaintiff

Samson has here, the Defendants must provide a legitimate, nondiscriminatory reason for its

actions. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). It is then up to the

plaintiff to establish that this alleged reason is a pretext for discrimination. Id.

Defendants claim they placed Plaintiff Samson on a 15-month leave that produced no

investigation, in order to investigate her concerns about her own workplace safety. Plaintiffs have

established this allegedly nondiscriminatory rationale as a pretext earlier in this brief, in the

 retaliation  section under  pretext.  That section is incorporated herein by reference.

Plaintiff Samson has established her prima facie case of age and race discrimination; and

31

Defendants allegedly nondiscriminatory reasons for taking adverse action against her was a pretext. Accordingly, Defendants motions for summary judgment on these claims should be overruled.

## IX.  Hostile Work Environment Based on National Origin

The phrase no ticki no washi stereotypes Asian people, i.e., that they work in Chinese laundromats, that they cannot speak English properly. (Samson 298). Tomlinson, Wheeler, Zeigler, and Miletti have all used this phrase while meeting with Samson. (Id. at 294-95). Furthermore Gibbons has called Samson the Pineapple Princess. (Id. at 303).

Plaintiff Samson was born in the Philippines in 1948 and became a U.S. Citizen in about 1983. (Samson 7-8, 10). She is deeply insulted by Defendants making these derogatory remarks.

A case of hostile work environment based on race follows the shifting burdens as does a case of hostile workplace based on sex. Plaintiff Samson s argument regarding her claim of hostile work environment based on race incorporates by reference the argument already made above in insofar as e.g. Plaintiff has already established that she was subjected to a tangible adverse employment action.

Accordingly, Defendants Motion for Summary Judgment on Plaintiff Samson s claim of hostile work environment based on national origin should be overruled.

Accordingly, Defendants Motion to Dismiss insofar as it denied that Agarwal was a supervisor should be denied. He was a supervisor for purposes of Chapter 4112. He therefore may be found personally liable under Chapter 4112. Genaro, supra.

## X.  Assault

Dr. Agarwal demanded, verbally abused, and shouted at Ms. Homan, and spoke to her in

32

threatening and aggressive tones ( Homan 74-75); and as a result she was frightened of him.

(Homan 74-75; see also Bartter 119-121). Thus when Dr. Agarwal escalated his hostilities by

brandishing a scalpel inches from her face on several occasions, she reasonably felt fear for her

safety. (Anthony  47; see also e.g. Motion for Temporary Restraining Order against Agarwal,

docket. #70.)

      Assault is the willful threat or attempt to harm or touch another offensively, which threat

or attempt reasonably places the other in fear of such contact. Jacobs v. Village of Ottawa Hills,

111 F. Supp. 2d 904, 918 (N.D. Ohio 2000) Defendants do not seriously deny that Agarwal (who

verbally abused Ms. Homan on many occasions) brandished a scalpel just inches from her face.

See Motion for Summary Judgment against Homan at pp 12-13 But they label the brandishment

a mere  gesture  rather than a  threat or attempt to harm or touch another offensively.

Furthermore Defendants do not dispute that Agarwal s brandishment of a scalpel just inches from

Homan s face placed her  in fear of [offensive] contact.  (See Motion for Summary Judgment

against Homan at p. 13; see also e.g. Shadwick at 50-51). Instead they argue that it was not

 reasonable  for Homan to feel fear.

      But why Agarwal brandished a scalpel at Homan   an employee he had verbally abused

and yelled at on numerous occasions in the past   is a disputed issue of fact in this case. Cf. e.g.

Bowser v. Bembro, 34 Ohio L. Abs, 253, 36 N.E. 2d 998 (Ct. App. 1941) (evidence of the

negative feelings defendant had about plaintiff before the alleged assault admissible to establish

his mental state at the time of the alleged assault.) And reasonable minds can differ over the

 reasonableness  of the fear Homan experienced when a previously verbally abusive man

suddenly waved a scalpel in her face.

33

Reasonable minds can differ; and there are genuine issues of material fact in dispute. Under Fed. R. Civ. P. 56, therefore, Plaintiff s assault claim may not be decided in Defendants favor upon summary judgment. It must instead go to a jury to decide.

**XI.    Whistle Blower/Public Policy**

In count 9 of their First Amended Complaint in Case No. 5:00CV1326, Plaintiffs alleged that they were retaliated against for reporting fraud of public funds in violation of Ohio s Whistle Blowing Statue. Specifically, Plaintiffs discovered that Defendant Cuyahoga Falls Hospital was double-billing medicaid and medicare in violation of 31 U.S.C. §3729. See May 25, 2000, Complaint, paragraphs 18-20, 29-36. Plaintiffs reported the double billing to their supervisors (paragraph 21); but instead of responding to Plaintiffs  reports by stopping the fraudulent acts, Defendant responded by retaliating against Plaintiffs. See paragraph 21-23

Ohio s Whistleblower Statute RC 4113.52 provides protection for employees who are disciplined for reporting a violation of  any federal statute...that his employer has authority to correct...  R.C. 4113.52(A)(1)(a). Defendant here violated 31 U.S.C. §3729, and Plaintiffs complied with R.C. 4113.52 so as to merit the Act s protection for their reporting of that violation. Furthermore, even if arguendo Plaintiffs failed to comply strictly with R.C. 4113.52, the retaliation Plaintiffs suffered for filing a complaint exposing Defendants  fraud under the False Claims Act  entitle[s them to] maintain a common law tort action against the employer for wrongful discharge/discipline in violation of public policy pursuant to Greeley v. Miami Valley Maintenance Contrs., Inc. (1990), 49 Ohio St. 3d 228, 551 N.E. 2d 981 and its progeny.  Cf

Kulch v. Structural Fibers, Inc., [3] 78 Ohio St. 3d 134 (1997), at syll. par. 1 (OSHA claim); see also First Amended Complaint, 10th Cause of Action, paragraph 58.

## XII.  Intentional Infliction of Emotional Distress

According to Defendants, Plaintiffs claim of intentional infliction of emotional distress must be denied upon summary judgment because it is based only on Agarwal s boorishness and not on outrageous conduct. See Defendants motions at 16 (Homan) and 17 (Samson). But the reality is that Plaintiffs base their claim on Agarwal s emotional and physical intimidation; and on his physical threats toward Homan with a scalpel. Since allegations that a co-worker physically threatened (a plaintiff) arguably rises to the level of outrageous behavior sufficient for a finding of intentional infliction of emotional distress,  (MacNeil v. Case Western Reserve University, 105 Ohio App. 3d 588, 594 (1995) (emphasis added), Defendants Motion for Summary Judgment on Plaintiffs  intentional infliction of emotional distress claim should be overruled See also Reamsnyder v. Jaskolski, 10 Ohio St. 3d 150 (1984) (claim stated with allegation that Defendant threatened to tear plaintiff s face off.)

## XIII.  Conclusion

Plaintiffs respectfully ask this court to overrule Defendants Motion to Dismiss the Complaint and Defendants Motion for Summary Judgment against Plaintiff Homan and Samson.

---

[3]Defendants reliance on Wiles v. Medina Auto Parts, 96 Ohio St. 3d 240(2002) for a contrary proposition is misplaced. Wiles applies only when an employee s Greeley claim arises out of his employer s alleged violation of the FMLA, which (unlike the FCA) has its own remedial scheme intended to make the employee whole.